UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 1:24-cv-987 |
| Plaintiff, | **COMPLAINT FOR PERMANENT** |
| v. | **INJUNCTION, MONETARY** |
| | **JUDGMENT, AND OTHER** |
| CARE.COM, INC., | **RELIEF** |
| Defendant. | |

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint alleges:

1.     The FTC brings this action for Defendant's violations of Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), and the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8403, in connection with the sale of care-related services on Defendant's platform. For these violations, the FTC seeks relief, including a permanent injunction, monetary relief, and other relief, pursuant to Sections 5(m)(1)(B), 13(b), and 19 of the FTC Act, 15 U.S.C. §§ 45(m)(1)(B), 53(b), 57b, and Section 5 of ROSCA, 15 U.S.C. § 8404.

## SUMMARY OF CASE

2.     Defendant Care.com, Inc. ("Care") operates an online platform and smartphone application that allows consumers seeking in-home care services ("seekers") to create job postings to which consumers seeking employment ("providers") can apply. These jobs, or "gigs," include providing care for children, seniors, individuals with special needs, and pets, as well as related services such as tutoring and housekeeping. To fully access the platform,

including the ability to hire providers or apply to jobs, consumers must purchase an auto-renewing membership or subscription over the Internet. Between January 2019 and March 2022, approximately 2.9 million consumers in the United States purchased at least one of Care's auto-renewing memberships.

3.      To convince providers to purchase paid memberships, Care advertises (1) that they can earn certain hourly and weekly rates, as well as (2) the number of job opportunities available on its platform. However, Care's earnings claims are not based on actual wages earned by providers. Care also grossly inflates the number of jobs it advertises as available on its platform by including a significantly large number of job postings that it knows, or should know, are unlikely to result in employment. These postings, which have comprised more than half of all job postings on the platform, are derived from potential seekers who have not purchased an auto-renewing subscription and therefore, at all times relevant to this Complaint, have not been eligible to hire providers under Care's terms of service. Care never discloses this material fact to providers, even after providers purchase auto-renewing memberships.

4.      When seekers and providers attempt to cancel their auto-renewing memberships, Care frustrates their ability to do so. Many are unable to determine how to begin the cancellation process to stop recurring charges. Consumers who manage to locate the inconspicuous cancellation flow must then navigate a multipage process rife with deceptive design tactics, known as dark patterns, that limit the number of people who successfully cancel. Indeed, Care has even flagged at least one aspect of its provider cancellation flow as a "Dark UX [user experience] Pattern." Consequently, tens of thousands of consumers have complained about Care's cancellation process, including that they canceled their auto-renewing membership, only to later be billed again. Many consumers who seek to contact Care related to cancellation issues,

2

or other issues they may encounter, such as inability to find a job, have difficulty reaching customer service for assistance and are rarely given full refunds.

## JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355.

6.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1), (b)(2), (c)(2), and (d), § 1395(a), and 15 U.S.C. § 53(b).

## PLAINTIFF

7.    The FTC is an independent agency of the United States Government created by the FTC Act which authorizes the FTC to commence this district court civil action by its own attorneys. 15 U.S.C. §§ 41–58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces ROSCA, 15 U.S.C. §§ 8401 *et seq.*, which, *inter alia*, prohibits charging consumers for goods or services on the Internet through negative option marketing without meeting certain requirements to protect consumers.

## DEFENDANT

8.    Care is a Delaware corporation with its principal place of business at 1501 S. Mopac Expy #340, Austin, TX 78746. Care transacts or has transacted business in this District and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, Care has advertised, marketed, and sold memberships for its online platform to consumers throughout the United States.

3

## COMMERCE

9.     At all times relevant to this Complaint, Care has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANT'S BUSINESS ACTIVITIES

10.     Care lures seekers to create free job postings, in many instances unintentionally. Seekers are unable to hire providers pursuant to these postings without upgrading to a paid, auto-renewing membership. Care then includes these job postings in its unsubstantiated earnings claims and inflated job totals, both of which it uses to lure providers to pay for access to its platform. Care then traps both seekers and providers in auto-renewing memberships, failing to provide a simple mechanism to cancel recurring charges.

### *Seeker Memberships and Deceptive Network Effects*

11.     Care offers two types of memberships for seekers, Basic and Premium. A Basic seeker membership is a free, non-auto-renewing membership that allows seekers to post jobs and search for providers ("Basic seeker"). To become a Basic seeker, consumers must answer a series of questions and provide information, including their email address, zip code and the type of care for which they are looking. Once this information is provided, Care informs the consumer that their Basic seeker account has been created and that Care has identified a specified number of caregivers for them. Care then prompts Basic seekers, "let's find the best fit for you," before posing further questions, including when care is needed, and the range the Basic seeker would be willing to pay a provider for their services.

12.     Consumers' answers to Care's questions automatically generate a job posting on the platform that providers may apply to for approximately three weeks. Care, however, fails to

4

inform Basic seekers that their answers will create a job posting. Many Basic seekers are therefore unaware that they are creating a job posting.

13.     Even after creating job postings, Basic seekers cannot communicate with providers and therefore cannot hire them, even though Care notifies Basic seekers when they receive applications for their job posting. To read a job application or hire a provider, Basic seekers must upgrade to Care's paid, auto-renewing, Premium membership ("Premium seekers"), which can be purchased as a monthly, quarterly, or yearly subscription, and costs approximately $39.99, $75.99, and $155, respectively. As discussed in more detail in Paragraphs 33-36, *infra*, providers are neither informed by Care of the distinction between Basic and Premium seekers, nor are they able to distinguish between job postings from Basic or Premium seekers.

14.     Consequently, since at least January 2019, millions of job postings on the Care platform have come from Basic seekers who never upgraded to a Premium seeker membership that would have allowed them to hire providers. As a result, the Care platform appears to offer more jobs, and thus appears to have a higher demand for providers, than truly exists. By creating this deceptively high demand for providers, Care lures more providers to the platform. In a self-perpetuating cycle, the increase in the supply of providers also attracts more seekers to the platform, even though Basic seekers are unable to hire providers. As Care acknowledged in a 2018 public filing with the Securities and Exchange Commission ("SEC"):

> We benefit from significant network effects…As more families use our services, we attract more caregivers seeking a large pool of families in need of caregiver services. Similarly, the increasing number of caregivers using our services has attracted more families. This cycle has driven more and more people to use our services and has resulted in a significant percentage of our new members coming from unpaid sources.

### *Unsubstantiated Earnings Claims*

15.     Care attracts providers to sign-up for one or more of its auto-renewing

memberships, which vary in price from approximately $8.99 per month to $19.99 per year, by

advertising unsubstantiated earnings claims about what can be earned through gigs obtained

through its platform. Since at least 2019, Care has advertised earnings claims nationally on third-

party websites, such as, "Find jobs starting at" $X/hour, jobs paying "up to" $X/hour, and "Top

[nannies and tutors] can earn up to $1,000/week."

16.     To convince seekers and providers to pay for a Care subscription, the company

has advertised the "average" pay rates for various job types, such as senior care providers, on its

website. These advertised rates are typically substantially lower than the rates shown in Care's

third-party advertisements. For instance, between October 2019 and December 2020, Care's

website advertised that, nationally, the "Average rate", "average pay rate", and the "average

senior care rate charged by caregivers on Care.com" was between $13.00 and $14.50 an hour.

However, during approximately this same time Care advertised nationally on third-party sites

that providers could expect to "Find senior caregiver jobs starting at $18/hr".

17.     Similarly, in 2021, Care ran a national advertisement on a third-party website

promising "Childcare jobs from $18/hr," while simultaneously stating on its website that, "On

average, the national pay rate for babysitting jobs" and "The average rate for babysitters on

Care.com" was between $13 and $14.25 per hour.

18.     Care lacks substantiation to make its earnings claims. It does not track, and does

not know, (1) the number of providers who find a job through its platform or (2) the hourly

wages earned by those who find a job through its platform. Further, despite pay differences

across different geographic regions, Care often disseminates its advertisements, containing

uniform earnings claims, nationally.

19.     As described above, Care's earnings claims list specific hourly pay for specific job types. These earnings figures are the result of Care's calculations, which it derives from pay ranges offered in *all* job postings of a given type on its platform. However, as discussed in Paragraph 14, *supra*, *millions* of job postings are from seekers with a Basic seeker membership who never upgraded to a Premium seeker membership that would have allowed them to hire providers.

20.     Specifically, between January 2019 and March 2022, approximately 4.7 million job postings, or 56% of all jobs posted on the platform, were created by Basic seekers who never upgraded to Premium, and therefore, would not, and did not, hire a provider through the platform. Consequently, Care's earnings claims rely upon millions of job postings that would not, and did not, result in employment.

21.     The remaining 44% of job postings on the platform, approximately 3.6 million jobs, were created by seekers who at some point in time upgraded to Premium or had an equivalent membership for businesses. But Care does not know which of these job postings led to employment, or at what hourly pay rate. Consequently, Care's earnings claims also rely upon *millions* of hypothetical job postings.

22.     Care's earnings claims are therefore unsubstantiated.

### Misleading Job Postings and Job Statistics

23.     In addition to using baseless earnings claims to induce providers to sign up for its subscriptions, Care misleads providers about the number of jobs available through its platform.

24.     A consumer search on a search engine for a gig providing care or a related service frequently will yield links to Care's national landing page or a local landing page, depending on

7

the exact search query, such as, "nanny jobs" or "nanny jobs near me."

25.     Care's landing pages are customized to the type of gig for which the consumer is searching (e.g., babysitters or senior care providers). The national landing page for providers contains a section with the title "[type of job] by the numbers" with a specific number of jobs immediately below it, such as "24,215 jobs" babysitting. Care's claims about the number of available jobs include all job postings on the platform at that point in time, including *all* the babysitting jobs posted by Basic seekers. Directly below the claimed number of jobs, and at times other locations on the page, Care asks consumers, "When do you want a job?," and provides several links to click in response, such as "Right Now." Care does not disclose that many of the job postings the provider will soon see cannot result in employment either "Right Now" or at any point in time, unless the seeker upgrades to Premium. Clicking any of these selections takes the consumer to a new page to start the process of creating a Care account and purchasing an auto-renewing membership.

26.     At the top of its local landing pages, which are tailored to specific geographic regions, Care claims that a specific number of the relevant types of job postings in that specific geographic region are available on its platform at that point in time, such as "Search 186 nanny jobs in Colorado Springs, CO." An example of this display is shown in **Figure 1**.



**Figure 1**: Exemplar of a local landing page.

8

27.     These 186 "jobs" also include jobs posted by Basic seekers within that geographic region. Immediately below the number of jobs is a large orange button that reads "Join free to get started" that if clicked, takes the consumer to a new page to start creating a provider account and purchase an auto-renewing membership.

28.     Creating a provider account and purchasing an auto-renewing membership can also be accomplished through clicking various "Join now," "Search," and similarly labeled bright orange buttons prominently displayed on most pages of Care's website.

29.     Regardless of the avenue, Care directs many consumers to answer two questions: where they live and the type of work they are pursuing. Based on the consumer's responses, Care then claims that a specific number of jobs are available on its website for each consumer, such as "1483 child care jobs near you!" An example of this display is shown below in **Figure 2**.



**Figure 2**: Exemplar of job display during creating and purchasing Provider membership.

30.     Care also makes claims about the number of jobs near a consumer on several pages a consumer visits in creating an account, including, in some instances, the page where

Care discloses the terms of its auto-renewing memberships. An example of this display, which also claims a specific number of jobs is available "right now", is shown in **Figure 3.**



**Figure 3**: Exemplar of job display on Provider membership disclosure page.

31.     As with the local and national landing pages, the specific number of jobs that Care claims is available includes job postings by Basic seekers.

32.     Because the Basic seeker membership does not allow seekers to communicate with providers, and since the majority of job postings on the platform are created by Basic seekers who never upgrade to Premium, most jobs included in Care's advertised job numbers are unlikely to ever result in employment, let alone "right now." Care thus vastly overstates the actual number of hirable jobs on its platform, and therefore, misleads providers about the likelihood that a provider who signs up for a paid membership will obtain a job through the platform.

33.     On both the national and local landing pages Care also displays a list of job postings for the provider to peruse. In these lists Care includes postings from Basic seekers and from Premium seekers without distinguishing between the two types of postings. This display

10

reinforces Care's false advertised job figures. Clicking on any of these job postings takes the consumer to the posting, which also contains at least one, and in many cases two, large, brightly colored buttons that read, "Join now" or "Join to apply." Clicking either button takes the consumer to a new page to start the process of creating a Care account and purchasing an auto-renewing membership. As alleged above, on the disclosure of terms page to purchase an auto-renewing membership, Care continues to display misleading job numbers to providers. At no point during the process does Care disclose that its job figures, or job postings, include jobs from Basic seekers who are unable to communicate with providers through the platform, and therefore are unable to hire providers, unless the seeker purchases a Premium membership.

34. Providers who sign up for paid Care memberships continue to see postings from both Basic and Premium seekers without distinction. Even when providers apply to these postings, Care does not inform the provider which postings are made by Premium or Basic seekers. Because the providers cannot distinguish which job postings are made by Premium or Basic seekers, providers are frustrated by the Care platform's inefficient search for jobs. Providers must expend money, including potential renewal charges, and time to apply for jobs and await responses to job applications most of which go unanswered. As an example of providers' frustration with the Care platform, in late 2019, one consumer wrote in a review of Care:

> "Have been trying to get a job as a nanny. Have applied to 10 jobs a day for 1 month. Even upgraded my membership to premium NOT A SINGLE RESPONSE! I have excellent local references credentials and lots of experience. Amazed to read other reviews And to learn other people have the same issues with the site. I get better response on craigslist. Waste of time and $$$".

35. Providers learn of the truth behind the futility of their applications later, if ever. As an example, in January 2023, a provider and a seeker exchanged comments on Care's

Facebook page, which Care monitors. In that exchange, the provider wrote that she "tried to reach out [to] new clients for cleaning services. I sent many messages and nobody answered." In response, the seeker commented that "they can't see the messages or respond to them without paying for an account . . . ." Replying, the provider commented "I didn't know…."

36.     Many consumers never learn that they have been applying to jobs for which they are unlikely to be hired and instead conclude that the platform is besieged with fake job postings. For instance, in February 2021, a consumer complained that the platform contained "fake pictures and job posts to lure job seekers" into signing-up for auto-renewing memberships. A year later another consumer wrote in a review of the platform that "I have been on the site for a while now and about 80% of the jobs on there are fake."

### Care Fails to Provide a Simple Cancellation Mechanism

37.     For paying seekers and providers, Care fails to provide a simple mechanism to cancel recurring charges associated with their auto-renewing memberships.

### Care's Cancellation Mechanism is Difficult to Find

38.     To cancel Care's auto-renewing memberships, seekers and providers must first find their respective cancellation flow. Reaching the cancellation flow requires both seekers and providers to click on a series of links, most of which do not mention cancellation. As a result, Care's cancellation flow is difficult to find, which both consumer complaints and Care's testing confirm.

39.     Care is aware consumers have difficulty navigating to its cancellation flows. In December 2019, a project manager alerted Care's Chief Marketing Officer that many of the complaints about cancellation, which is referred to internally as a "downgrade," "are related to difficulty getting to the downgrade flow." For instance, in June 2021, a consumer complained to

Care that its "[w]ebsite is designed to hide the ability to cancel. There's no cancellation from the main page and you have to search[ …] in order to cancel. This is purposeful obfuscation and fraud." That same month, another consumer complained to Care that its "website is designed [in] such a way that it[']s super difficult to find how to downgrade their membership. You have to Google it to find the steps[.] [T]hat[']s how difficult they have it."

40.     Some consumers are never able to locate the flow, notwithstanding searching the platform and third-party search engines for additional information. As examples, consumers have complained "I attempted to cancel online, IMPOSSIBLE", "trying to cancel my membership. It's IMPOSSIBLE to do!!", and "they have made the process impossible to cancel. I cannot find any way to cancel on the site." This contrasts with the ease of finding the path to purchase an auto-renewing membership, which consumers can accomplish by clicking one of several brightly colored, large buttons with clear labels, such as "Join now," that Care places on most pages on its website.

41.     Care has engaged in testing of its cancellation flows, including testing how consumers find its cancellation flows. Specifically, Care tested, and then implemented, moving a link that Premium seekers can click to enter the cancellation flow to a less conspicuous location lower on the page where consumers would be less likely to find it. Care conducted this testing to see if it would "reduce our cancellation rate" or cause a "Reduction in CTR [click through rate] to 'Cancel Membership.'" In short, rather than making it simpler for consumers to find its cancellation flows, Care instead chose to make the flows more difficult to locate.

42.     Consumers who successfully locate the Account & Settings or the My Profile and Settings pages can look for the link to click to start the process of cancelling their memberships. Care provides various cancellation flows that differ depending upon the type of membership. For

13

paid auto-renewing memberships, each flow is complicated and frustrates consumers' attempts to cancel.

*Care Fails to Provide Premium Seekers with a Simple Mechanism to Cancel*

43.     For example, Care's Premium seeker cancellation flow, starting on the Account & Settings page, is a six-page process that consumers must navigate to complete cancellation of recurring billing. Notwithstanding that many seekers are elderly, infirm, or busy childrearing, in these six pages, Care poses a variety of obstacles to cancellation, including: offering consumers at least four exits to the cancellation flow, requiring consumers to complete three pages of questions that could be presented in less taxing ways or upon completion of cancellation, warning consumers twice of the consequences of cancelling, and offering the purchase of a different membership in lieu of cancelling.

44.     Premium seekers who figure out how to locate their Account & Settings page find that it is divided into five sections. *See* Attachment A1. None of these five sections is labeled cancellation. Rather, to cancel their subscription and locate the date by which they must cancel before their membership renews (titled "Next Billing Date"), Premium seekers must navigate to the second section labeled "Membership Information." Seekers must then click a "Cancel subscription" hyperlink in this section. Many consumers cannot find this hyperlink because it is inconspicuously located in the middle of the Account & Settings page, in a section that is not prominently labeled or otherwise emphasized.

45.     Premium seekers who successfully locate and click the "Cancel subscription" hyperlink in the Account & Settings page nevertheless have not cancelled their accounts. Instead, clicking "Cancel subscription" merely redirects Premium seekers to the second of six pages in the cancellation flow. *See* Attachment A2. The second page prominently displays the benefits of

14

Premium seeker membership and warns seekers of the loss of benefits if they cancel. Care prominently displays on this page two orange buttons that read, "Book a sitter" and "Stay Premium." Clicking either will redirect the seeker, without further warning, out of the cancellation flow and into another page to search for providers. If the Premium seeker realizes that they were unsuccessful at cancellation, they must locate and begin the cancellation flow again. To move forward with cancellation, the seeker must locate and identify one of two significantly smaller hyperlinks that read, "Continue to cancel." These links are presented in font that is less distinct than the prominent orange buttons, are not offset in a bright color, and are not bolded, underlined, or otherwise emphasized to indicate that they are links rather than plain text.

46.     The third page in the cancellation process presents the first of three survey questions. *See* Attachment A3. Before approximately 2019, on at least Care's mobile web version, all three of these questions were consolidated onto a single page in the cancellation flow. However, Care subsequently established a stand-alone page for each question. As a result, Care unnecessarily lengthened the cancellation flow and made cancellation more taxing. Care does not offer seekers the opportunity to skip these questions.

47.     Between the unnecessary question pages, Care presents Premium seekers with a fourth page in the cancellation flow. This fourth page includes a save offer that attempts to dissuade the consumer from cancelling their membership. *See* Attachment A4. Care offers seekers the opportunity to remain members for a reduced price, typically $10 per month for six months. Seekers can accept this offer by clicking a large orange button that reads "Stay Premium." Seekers who select this orange "Stay Premium" button are removed from the cancellation flow and taken to a new page that confirms their auto-renewing membership has been immediately converted to a non-renewing membership at a reduced price for a certain

number of months.

48.     Seekers who do not want to accept Care's new offer must locate a less conspicuous, less prominently placed button. At the very bottom of the fourth page, in light grey deemphasized font against a white background, is a "Continue to cancel" link, which, if seen and selected, directs the consumer to the fifth page in the cancellation process. On a mobile browser, seekers may need to scroll to see the "Continue to cancel" link.

49.     The fifth page in Care's cancellation process contains another survey question. *See* Attachment A5. The Premium seeker must select the blue "Continue" button at the bottom of this page to finally navigate to the last page of the cumbersome cancellation process.

50.     On the sixth and final page of the cancellation flow, Care poses a third survey question. *See* Attachment A6. To complete the cancellation flow and successfully cancel, the user must select the "Confirm cancellation" button toward the bottom of the page. Finally, if the consumer has successfully navigated through all these pages, Care displays a confirmation page. *See* Attachment A7.

51.     At no point in this cancellation flow does Care provide a progress notification (e.g., "Page 2 of 6") to inform the Premium seeker of their status toward cancelling their negative option membership. Care also does not provide seekers the opportunity to skip its series of unnecessary questions and the save offer within the cancellation flow. In several instances, Care provides links to divert the seeker from the cancellation flow that are more prominent, brighter in color, or otherwise more noticeable than the link to continue the cancellation flow.

52.     The Premium seekers' cancellation flow was designed, in part, to limit the number of consumers who cancel. Care conducted testing comparing the rate of Premium seeker cancellations when its cancellation flow was limited to four or five pages compared to its current

16

six-page downgrade flow. Internally, Care acknowledged that a goal of these studies was to "improve the save rate" – in other words, to reduce the number of Premium seekers who successfully cancel their recurring charges. These studies demonstrated that six pages "save," or prevent, more members from cancelling than four-or five-page cancellation flows.

53.     By contrast, Care does offer some consumers less burdensome cancellation options. For instance, the Basic seeker cancellation flow, which is the free non-auto-renewing membership, consists of only two pages. Finally, in mid-to-late 2022, Care began providing seekers and providers in California with a one-click to cancel option.

54.     Other features of the cancellation flow also reflect the results of Care's testing. For example, Care's testing revealed that more consumers select orange buttons over deemphasized options when purchasing a membership. Similarly, the second and fourth pages of the cancellation flow present orange buttons that divert seekers from the cancellation flow while deemphasizing the links necessary to continue cancellation.

55.     Given Care's failure to provide a simple mechanism to stop recurring charges, many Premium seekers believe they cancelled, only to discover that they continue to be billed for their auto-renewing membership. Care receives many complaints from consumers who believed they had canceled, as well as complaints about other difficulties with the Premium seeker cancellation process. One consumer reported to Care that "The site makes it difficult to cancel. It takes you through 4 or 5 pages of questions asking if you are sure. We may have done something wrong during the cancellation process since it is not straight[ ]forward." Another consumer complained "This business uses misleading practices when attempting to cancel your membership. There are multiple 'proceed to cancellation' links in small fonts, so when you think you have cancelled your membership, you didn't actually do so and they continue charging and

refuse refunds even though you haven't used the services." The consumer added "I would also like their website changed so that you need to click no more than 2 buttons to cancel the membership. It is misleading and unethical." Care responded, in part, by stating that the consumer's feedback "will be documented for our Product Development Team." However, despite this assurance, Care has not simplified its Premium seeker cancellation flow in any of the ways suggested by these customers.

<u>*Care Fails to Provide Providers with a Simple Mechanism to Cancel*</u>

56.     The provider cancellation flow, starting on the My Profile & Settings page, is at least a four-page process that consumers must navigate to complete cancellation. In the four required pages, Care poses a variety of obstacles to cancellation, including two pages that contain optional questions, one page with confusing options from which to choose, and a save offer of a new negative option, auto-renewing membership.

57.     Providers who can locate their My Profile & Settings page find that it contains eight sections. *See* Attachment B1. The provider My Profile & Settings page makes no reference to cancellation and in no way indicates to providers who want to cancel how they can do so. Instead, to continue with the cancellation flow, providers who wish to cancel must locate and click a link labeled "Manage Plan", which is inconspicuously located under the "Membership Information" heading.

58.     Providers who can figure out that they must click on "Manage Plan" are taken to the second page in their cancellation flow that still does not identify that they have arrived at the cancellation flow. Moreover, this page does not provide a clear or straightforward method for cancellation. Instead, the second page of providers' cancellation flow contains a series of confusing options. *See* Attachments B2 and B3.

18

59.     At the top of the second page of the cancellation flow, Care prominently reminds providers of the type of membership they currently have, the benefits of that membership, and, for the first time, the date their membership will auto-renew. *Id*. Immediately below this information, toward the middle of the page, providers are presented with a "Change your subscription" section. In this section, Premium providers are offered the option to purchase a Basic membership, which unlike the seeker side is not free, or Basic providers are offered the option to purchase a Premium membership. *Id*.

60.     Toward the bottom of this second page Care offers providers the option to "Pause your account." *Id*. This "pause" is what providers must click to continue the process to cancel their recurring charges. Notably, the button does not read "cancel", "close", or any option that clearly establishes that the consumer is opting to permanently stop recurring billing. Only in smaller font, below the "Pause your account" button, is a statement that reads in part "Cancels recurring billing." *Id*. Providers are not informed at any time prior to this that "Pause your account" is the option that they must select to cancel or stop their recurring charges.

61.     The statement "Pause your account" implies a temporary stop in use of or billing for a membership and does not inform a provider seeking to cancel recurring billing that it is the correct option to cancel. Care's disclosure that a provider can continue to use the platform even after they pause is in smaller, fainter font that is overwhelmed by the large, bold hyperlink "Submit" button that consumers must click to proceed.

62.     Below the "Pause your account" and "Submit" buttons on the second page is a button labeled "Cancel" that does not actually cancel the provider's auto-renewing membership. Rather, clicking on "cancel" stops the process of cancelling the membership and removes the provider from the cancellation flow.

19

63.     Clicking "Basic" in the second section on the second page of the cancellation flow takes Premium providers out of Care's cancellation flow to another page where they can confirm they want to purchase a Basic membership. *See* Attachment B4. Tens of thousands of Premium providers entering this cancellation flow to cancel their auto-renewing Premium membership end up clicking Basic, which cancels their Premium membership but simultaneously purchases an auto-renewing Basic membership which costs approximately $18.99 and renews yearly. If providers want to cancel the Basic membership, they need to find the flow all over again and start the process from the beginning.

64.     If a provider clicks on the "Change your subscription" section on the second page, which is the first option they can choose, but then realizes on the next page that this is not the way to cancel their recurring charges, then, the provider must toggle back to the second page and try again. *Id*.

65.     A provider who realizes that the "Pause your account" option on the second page of the cancellation flow is, in fact, the cancellation button must then select the "Submit" button at the bottom of the page. Such a provider has not completed Care's cancellation flow but is instead redirected to the third page of the provider cancellation flow. *See* Attachment B6. In internal testing of its mobile web browser cancellation flow, a Care product manager characterized the use of a "Submit" button in the middle of the cancellation flow like this as a "Dark UX [user experience] Pattern" because "You're not actually done yet." This internal documentation acknowledges that "Submit" misleads consumers into believing that they have successfully completed the cancellation process. Likewise, Care's use of a "Cancel" button in a cancellation flow also is misleading: rather than "cancel[ing]" the consumer's membership, the "cancel" button instead stops their attempt to cancel their membership.

20

66.     Care has received complaints from consumers that the "Submit" button does not function properly. For instance, one consumer complained, "I tried to cancel my subscription to care.com…[T]he 'submit' button to cancel does not work. The process they have does not allow you to cancel the subscription...."

67.     Providers are also provided with a small hyperlink at the very bottom of the second page of the cancellation flow that reads "Permanently close my account." *See* Attachments B2 and B3. Both Basic and Premium providers who choose to either "Pause your account" and click "Submit" or the small hyperlink "Permanently close my account" on the second page must navigate two additional pages in the cancellation flow. Each additional page poses a survey question that appears mandatory to stop recurring charges but is in fact optional to answer. *See* Attachments B6 and B7. As with the seeker side, Care does not provide a "skip" button for these two questions, otherwise indicate they are optional, or reserve any such questions until post-cancellation.

68.     The unclear options listed on the second page to "Change your subscription," "Pause" or "Permanently close" an account lead many consumers to select one option, only to realize it is not what they intended. These consumers must navigate back to the second page to continue their search for the correct option to cancel recurring billing. As a result, tens of thousands of providers have expended time clicking through additional pages in the cancellation flow attempting to cancel recurring billing.

69.     It is not until the provider once *again* chooses to either pause or permanently close their account on the fourth page that their auto-renewing charges are finally cancelled. *See* Attachments B7 to B10. If the provider is unable to successfully navigate through all four of these pages, their membership is not cancelled, and they will continue to be billed. At no point in

this cancellation process does Care provide a progress notification (e.g., "Page 2 of 4") to inform the provider of their status toward effectuating a successful cancellation of their negative option membership.

### *Care's Failure to Provide Adequate Customer Service Also Frustrates Cancellation*

70.     Given that both seekers and providers have difficulty figuring out how to find and navigate the cancellation flows, many Care members resort to contacting customer service to cancel. Hundreds of thousands of Care memberships cancelled between January 2019 and March 2022 were cancelled through Care customer service representatives.

71.     However, cancelling through customer service can be difficult. For instance, at certain times, Care has provided a telephone number and email address for consumers to cancel their auto-renewing membership. However, consumers complained of significant difficulty successfully contacting Care using these options. For example, one consumer complained "I made numerous attempts to contact them by phone, but it was impossible to reach a live person. The hold time was usually close to an hour, sometimes longer." Other consumers complain that despite waiting weeks, they did not get responses to emails sent to Care. In some of these instances Care has honored cancellation requests, but in others it has not. As a result, many consumers who have contacted Care by phone or email to cancel their membership nevertheless continue to be billed for their auto-renewing membership.

72.     Members have the ability chat with customer service agents via a live chat option on the platform if they encounter difficulties cancelling or have other issues. However, many members have complained at various times that the chat function does not work. For instance, one consumer complained "the live chat option is either unavailable or if it is available, it immediately disconnects." Another consumer complained "I attempted to resolve the issue

through 'live chat,' which was offline. I then attempted again to contact the company five more

times through chat. Each time, I received a message that there were 'more than 30 customers' in

line ahead of me and was disconnected from chat, in one case after waiting for more than 1

hour."

73.     Many consumers try to contact Care because they want to cancel or want a refund

for charges that Care imposed on them after they believed they had cancelled. But Care's refund

policy is limited to charges the consumer incurred in the prior thirty days, and even then, is

limited to consumers who have not accessed their Care account since the most recent renewal

charge. However, consumers who access their account to cancel their membership after an

unwanted renewal charge may make themselves ineligible for a refund of that unwanted charge

by accessing their account. For example, in June 2021 a consumer complained:

> I have canceled my premium account with Care.com three separate times and their
> website gets stuck on a survey page every time. I have not been using their service since
> April of 2021 and they have charged me $40 a month even though I canceled my
> account. I emailed them and asked them for a refund but no one has ever emailed me
> back. I have called them and left voicemails and no one has responded. I am beyond
> frustrated and their customer service is non[-]existent. I really need the $120 back.

74.     This consumer was not refunded any of her money by Care.

### FTC's Notice of Penalty Offenses

75.     In October 2021, the FTC sent a letter to Care, along with a copy of the FTC's

Notice of Penalty Offenses Concerning Money-Making Opportunities.

76.     As detailed in the Notice, in a series of litigated decisions the Commission

determined, among other things, that it is an unfair or deceptive trade practice and violation of

Section 5 of the FTC Act to make false, misleading or deceptive representations concerning the

earnings that may be anticipated by a participant in a money-making opportunity (i.e., a person

who has been accepted or hired for, has purchased, or otherwise is engaging in the money-making opportunity). This includes, for example, representing, explicitly or implicitly, the earnings which may be secured by participants, when the representation is made without knowledge, or with only limited knowledge, of the actual profits or earnings usually and ordinarily received by participants.

77.     As the letter stated, the above acts or practices were prohibited by final cease and desist orders, other than consent orders, issued in the cases (cited in the Notice) in which the Commission determined they were unfair or deceptive and unlawful under Section 5(a)(1) of the FTC Act. The letter warned Care of its potential liability for civil penalties under Section 5(m)(1)(B) of the FTC Act, 15 U.S.C. § 45(m)(1)(B), for knowingly engaging in acts or practices determined by the Commission to be unfair or deceptive and unlawful, as described in Paragraphs 23-36 of this Complaint.

78.     Care received the letter and Notice on October 27, 2021.

79.     Approximately four months later, in March 2022, the FTC served Care with a Civil Investigative Demand ("CID") seeking documents and information pertaining to, among other things, Care's use of earnings claims in advertisements and any substantiation it had for these earnings claims.

80.     Despite learning of the FTC's investigation and despite receiving the Notice of Penalty Offenses, Care continues to engage in the deceptive conduct alleged above.

### *Care Fails to Provide a Simple Mechanism to Cancel Despite Knowledge of the Law*

81.     Care is aware that its automatically renewing memberships give rise to a statutory obligation under ROSCA to provide a simple mechanism to cancel recurring charges.

82.     For instance, in 2018 Care wrote in a Form 10-K filing with the SEC that "Many states have enacted laws specific to auto-renewing contracts and other states are considering such laws…Violation of a state auto-renew law can result in civil penalties and in many instances renders the contract unenforceable…We have been and are subject to regulatory investigations in connection with our auto-renew practices and compliance with unfair and deceptive trade practices laws."

83.     Care further disclosed in this filing that a California district attorney's office was investigating its auto-renewal related practices. This investigation resulted in a complaint by two California district attorneys' offices in California state court in June 2020 alleging, among other things, that Care fails "to provide a simple mechanism for consumers to stop recurring charges under its automatic renewal plan." The lawsuit settled shortly thereafter, and the state court entered a Final Judgment enjoining Care from failing to provide an "easy-to-use mechanism for CONSUMERs to immediately stop any future recurring charges."

84.     The FTC's March 2022 CID to Care sought documents and information pertaining to, among other things, whether Care "provided [consumers] a simple mechanism to stop recurring charges."

85.     Despite knowledge of the law and even after learning of the FTC's investigation, Care continues to violate ROSCA by failing to provide seekers and providers with a simple mechanism to cancel their automatically renewing charges.

## **VIOLATIONS OF THE FTC ACT**

86.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

87.     Misrepresentations or deceptive omissions of material fact constitute deceptive

acts or practices prohibited by Section 5(a) of the FTC Act.

## Count I – Unsubstantiated Earnings Claims

88.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of memberships to use Defendant's platform, including through the means described in Paragraphs 15-22, Defendant represents, directly or indirectly, expressly or by implication, that consumers who purchase a provider membership to use Defendant's platform will earn or are likely to earn substantial income, including specific hourly and weekly amounts.

89.     In many instances, Defendant's representations as described in Paragraph 88 are misleading or were not substantiated at the time the representations were made.

90.     Therefore, Defendant's representations as described in Paragraph 88 constitute a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count II – Misrepresentations – Jobs

91.     In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of memberships to use Defendant's platform, including through the means described in Paragraphs 23-36, Defendant represents, directly or indirectly, expressly or by implication, that a specified number of jobs are available on Defendant's platform.

92.     In fact, in numerous instances in which Defendant makes the representation described in Paragraph 91, the specified number of jobs are not available on Defendant's platform.

93.     Therefore, Defendant's representation as described in Paragraph 91 constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**VIOLATIONS OF THE RESTORE ONLINE SHOPPERS' CONFIDENCE ACT**

94.     In 2010, Congress passed ROSCA, 15 U.S.C. §§ 8401-05, which became effective on December 29, 2010. In passing ROSCA, Congress declared that "[c]onsumer confidence is essential to the growth of online commerce. To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business." Section 2 of ROSCA, 15 U.S.C. § 8401.

95.     Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for any goods or services sold in transactions effected on the Internet through a "negative option feature," as that term is defined in the Commission's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.2(w), unless the seller, among other things, clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information, and provides a simple mechanism for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account.

96.     The TSR defines a negative option feature as a provision in an offer or agreement to sell or provide any goods or services "under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(w).

97.     Defendant's auto-renewing memberships are a negative option feature as defined by the TSR. 16 C.F.R. § 310.2(w). Defendant charges consumers for its services sold in transactions effectuated on the Internet.

98.     Pursuant to Section 5 of ROSCA, 15 U.S.C. § 8404(a), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of ROSCA constitutes an unfair or deceptive act

or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count III – Failure to Disclose Material Terms

99.     In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as described in Paragraphs 23-36 above, Defendant has failed to clearly and conspicuously disclose all material terms of the transaction before obtaining consumers' billing information.

100.     Defendant's acts or practices as set forth in Paragraph 99 violate Section 4 of ROSCA, 15 U.S.C. § 8403 and are therefore violations of Section 18 of the FTC Act, 15 U.S.C. § 57a, 15 U.S.C. § 8404(a), and therefore constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## Count IV – Failure to Provide a Simple Mechanism for Stopping Charges

101.     In numerous instances, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as described in Paragraphs 37-74 above, Defendant has failed to provide a simple mechanism for a consumer to stop recurring charges for the good or service to the consumer's credit card, debit card, bank account, or other financial account.

102.     Defendant's acts or practices as set forth in Paragraph 101 violate Section 4 of ROSCA, 15 U.S.C. § 8403 and are therefore violations of Section 18 of the FTC Act, 15 U.S.C. § 57a, 15 U.S.C. § 8404(a), and therefore constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**VIOLATIONS OF PRIOR COMMISSION DETERMINATIONS CONCERNING
UNFAIR OR DECEPTIVE ACTS OR PRACTICES**

103.    If the Commission has determined in a proceeding under section 5(b) of the FTC

Act, 15 U.S.C. § 45(b), that an act or practice is unfair or deceptive and issued a final cease and

desist order, other than a consent order, with respect to the act or practice, then a person,

partnership, or corporation that engages in such act or practice with actual knowledge that such

act or practice is unfair or deceptive and is unlawful under Section 5(a)(1) of the FTC Act shall

be liable under Section 5(m)(1)(B) of the FTC Act, 15 U.S.C. § 45(m)(1)(B).

104.    In prior litigated decisions the Commission has determined that the acts or

practices described in Paragraphs 15-22, above, are unfair or deceptive and violate Section

5(a)(1) of the FTC Act and issued final cease and desist orders, other than consent orders, with

respect to those acts or practices.

**Count V – Violations of Prior Commission Determinations Known to Defendant**

105.    As set forth in Paragraphs 75-80, at least since receiving the letter and Notice,

Defendant had actual knowledge that, in connection with the advertising or promotion of money-

making opportunities, making false, misleading, or deceptive earnings claims – including,

specifically, representing the earnings which may be secured by participants, when the

representation is made without knowledge, or with only limited knowledge, of the actual profits

or earnings usually and ordinarily received by participants – is an unfair or deceptive act or

practice, unlawful under Section 5(a)(1) of the FTC Act.

106.    In numerous instances, as set forth in Paragraphs 15-22, Defendant represented,

directly or indirectly, expressly or by implication, that purchasers of provider memberships are

likely to usually and ordinarily earn certain hourly or weekly wages through jobs obtained

through its platform.

107.    In fact, in numerous instances in which Defendant made the representations set

forth in Paragraph 106, Defendant had limited to no knowledge of the actual hourly or weekly

wages usually and ordinarily earned by purchasers of provider memberships through jobs

obtained through its platform.

108.    Defendant engaged in the acts and practices described in Paragraphs 106-107 with

the actual knowledge, as set forth in Paragraph 107, that that the Commission has determined the

acts or practices are unfair or deceptive and violate Section 5(a)(1) of the FTC Act and issued

final cease and desist orders, other than consent orders, with respect to those acts or practices.

## CONSUMER INJURY

109.    Consumers are suffering, have suffered, and will continue to suffer substantial

injury as a result of Defendant's violations of the FTC Act and ROSCA. Absent injunctive relief

by this Court, Defendant is likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, the FTC requests that the Court:

A.      Enter a permanent injunction to prevent future violations of the FTC Act and

ROSCA;

B.      Award monetary and other relief within the Court's power to grant; and

C.      Award any additional relief as the Court determines to be just and proper.

Respectfully submitted,

Dated:  8/26/2024                          FOR THE FEDERAL TRADE COMMISSION:

EDWARD HYNES
New York Bar No. 4887584
ehynes@ftc.gov; (214) 979-9381
ERICA HILLIARD
Mississippi Bar No. 104244
ehilliard@ftc.gov; (202) 480-1033
1999 Bryan St., Ste. 2150,
Dallas, Texas 75201